UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PATRICK DEVERS, DAVID WOOD, RIVELINO
ZAVALA, COLLIS MOORE, and JOSEPH DIGIORNO,

                Plaintiffs,

    -against-

SNC-LAVALN GENERATION, INC., PETERSON INDUSTRIAL SCAFFOLDING, INC., and CHARLES WELDA, as aider and abetter,

                Defendants.
-----------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUL 30 2012 ★

LONG ISLAND OFFICE

**COMPLAINT**

Jury Trial Demanded

CV-12 3747

DEARIE, J.

POLLAK, M.

**SUMMONS ISSUED**

Plaintiffs PATRICK DEVERS, DAVID WOOD, RIVELINO ZAVALA, COLLIS MOORE, and JOSEPH DIGIORNO, through their attorneys, LEEDS, MORELLI & BROWN, P.C., allege upon knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

**JURISDICTION AND VENUE**

1.     This is a civil action brought pursuant to, and arising out of violations of, Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law, the New York City Human Rights Law, and any other cause of action which can be inferred from the facts set forth herein.

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(4).

1

3. Venue is proper pursuant to 28 U.S.C. § 1391(b).

4. The jurisdictional prerequisites to this lawsuit have been satisfied. Specifically, Plaintiffs filed a charge of discrimination with the Equal Employment Opportunity Commission and were issued a Right to Sue letter dated May 18, 2012.

## PARTIES

5. Plaintiff, Patrick Devers ("Devers"), was and still is a resident of the County of Queens, State of New York.

6. Plaintiff, David Wood ("Wood"), was and still is a resident of the County of New York, State of New York.

7. Plaintiff, Rivelino Zavala ("Zavala"), was and still is a resident of the County of Bronx, State of New York.

8. Plaintiff, Collis Moore ("Moore"), was and still is a resident of the County of Queens, State of New York.

9. Plaintiff, Joseph DiGiorno ("DiGiorno"), was and still is a resident of the County of Duchess, State of New York.

10. Defendant SNC-Lavalin Generation, Inc. ("SNC-Lavalin") is a business entity incorporated under the laws of the State of New York and its corporate headquarters is located in the County of Queens, State of New York.

11. Defendant Peterson Industrial Scaffolding, Inc. ("Peterson Industrial") is a business entity incorporated under the laws of the State of Missouri. Defendant is authorized to and purposefully engages in business in the State of New York, such business consisting of providing industrial scaffolding and soliciting business in the Counties of New York and Queens, State of New York.

12. Defendant Charles Welda ("Welda"), an individual, was, during all relevant times, Superintendent for Peterson Industrial, and was engaged in the course of his duties, responsibilities, and employment in the County of Queens, State of New York.

13. Welda was, at all relevant times, responsible for the operation of Peterson Industrial's services, including, but not limited to, management of issues concerning the employees. As such, Welda was, at all relevant times, charged with policymaking authority in the management of Peterson Industrial. As a policy maker, he was and is responsible with ensuring

that employees are not subjected to discriminatory and/or retaliatory practices.

## FACTUAL BACKGROUND

14. Devers and Wood are African-American males, Zavala is a Hispanic male, and Moore and DiGiorno are Caucasian males.

15. In spring 2009, SNC-Lavalin commenced construction on the Astoria Energy Expansion Project (the "Project") in Astoria, New York, which involved the construction of a fully functional 575 megawatt natural gas fired combined – cycle electrical power generation plant.

16. SNC-Lavalin was the general contractor on the Project.

17. In December 2009, Peterson Industrial began scaffolding work on the Project.

18. Peterson Industrial was one of SNC-Lavalin's subcontractors that provided industrial scaffolding.

19. In February 2010, Devers began his employment at Peterson Industrial in the County of Queens, State of New York, as a foreman performing scaffolding work.

20. In May 2010, Moore began his employment at Peterson Industrial in the County of Queens, State of New York, as a carpenter performing scaffolding work.

21. On May 2, 2010, DiGiorno began his employment at Peterson Industrial in the County of Queens, State of New York, as a carpenter performing scaffolding work.

22. On June 1, 2010, Zavala began his employment at Peterson Industrial in the County of Queens, State of New York, as a carpenter performing scaffolding work.

23. On July 27, 2010, Wood began his employment at Peterson Industrial in the County of Queens, State of New York, as a carpenter performing scaffolding work.

24. Throughout Plaintiffs' tenure at Peterson Industrial, Welda repeatedly made racially derogatory comments in the presence of Plaintiffs.

25. Welda, Plaintiffs' supervisor, used discriminatory and pejorative racial terms, including: "Nigger(s)," "Buckwheat," "Good old boys," "nappy heads," and "Take that big black buck and get the job done."

5

26. Welda would direct these comments at Wood and Devers on a weekly basis.

27. Throughout their tenure, in addition to complaining to Welda regarding his discriminatory comments, Plaintiffs repeatedly complained to Joseph Geiger ("Geiger"), President of the Union, and Angel Cedeño ("Cedeño"), carpenter and Union Shop Steward, about Welda's discriminatory comments, but Peterson Industrial failed to take any remedial action.

28. Moreover, in response to their complaints and/or due to his color, Welda repeatedly threatened Wood saying, "For a big black buck you should work harder," and "There are some good old Southern boys who would replace you."

29. Wood complained of Welda's comments to Willie Westmoreland, President at Peterson Industrial, Geiger, and Cedeño, but Peterson Industrial failed to take any remedial action.

30. As a result of their complaints, Welda would repeatedly threaten Plaintiffs with termination if they continued to complain.

31. In the beginning of May 2010, Welda placed a Confederate flag on the cover of the employee sign-in book, which remained there throughout

Plaintiffs' employment. As a result, Plaintiffs were forced to look at the Confederate flag each morning as they signed in for the day and each night as they signed out.

32. Plaintiffs complained to Cedeño about the Confederate flag, but Cedeño failed to take any remedial action regarding their complaints.

33. Moreover, shortly after complaining, Cedeño threatened Zavala saying, "Keep your mouth shut and you'll be fine."

34. In May 2010, Welda put a Confederate flag on his hardhat, which he wore throughout Plaintiffs' employment. Plaintiffs were forced to look at the Confederate flag as they worked.

35. Again, Plaintiffs complained to Cedeño of the Confederate flag on Welda's hardhat, but Cedeño failed to take any remedial action regarding their complaints.

36. As a result of Plaintiffs' complaints, Welda started overly criticizing and scrutinizing their work. For example, Welda criticized Plaintiffs for waiting for materials, assigned Plaintiffs more work than other employees, refused to provide Plaintiffs with drinking water during the summer months when temperatures exceeded one-hundred degrees Fahrenheit,

prevented Plaintiffs from wearing water-infused cooling vests during summer months, and threatened Plaintiffs daily saying, "If you can't handle it, I will bring in some good old boys from the South." Similarly situated employees who did not complain of Welda's discriminatory behavior were not treated likewise.

37. On October 28, 2010, Welda terminated Wood as the result of an alleged work shortage; however, a week after Welda terminated Wood, Peterson Industrial hired three to five new employees.

38. On or about November 15, 2010, when Devers, Zavala, Moore, and DiGiorno returned from lunch, they saw a noose hanging for the scaffolding. Welda falsely claimed that it was a workman's knot and not a noose.

39. Devers responded by complaining to Welda that the noose was racially intimidating and harassing.

40. Welda then said, "In New York, that's maybe how they tie knots." Devers stated that both Welda and he were from Louisiana and they knew what the hanging of a noose symbolized. Devers added that he had performed scaffolding work in other states, including New York, and he had never seen a noose used to hoist materials. Upon information and belief, Welda

knowingly hung a noose as a means to subject Plaintiffs to a racially hostile work environment and in retaliation for their complaints of discrimination.

41. On or about November 16, 2010, Devers, Zavala, Moore, and DiGiorno complained of the noose to Welda, Darien Martino, Safety Officer for Peterson Industrial, and Cedeño, but no action was taken.

42. On November 18, 2010, Welda terminated DiGiorno for an alleged safety violation. DiGiorno, however, had not committed a safety violation and, moreover, similarly situated employees who did not complain of discrimination were not terminated for safety violations. The reason given for DiGiorno's termination was pretext for Welda's otherwise discriminatory and retaliatory behavior.

43. On November 23, 2010, Devers, Zavala, and Moore complained to Geiger about the noose and the discrimination to which they were being subjected. Geiger failed to take any remedial action regarding their complaints.

44. On or about November 26, 2010, Devers, Zavala, and Moore complained to Dennis Walsh ("Walsh"), Union Review Officer, about the

discrimination and/or retaliation to which they were being subjected. Walsh failed to take any remedial action regarding their complaints.

45. On November 29, 2010, as a result of Devers, Zavala, and Moore's complaints of discrimination, the Union visited the worksite to address the noose incident. Geiger and Salvatore Antonucci ("Antonucci"), Union's Business Agent, interviewed several employees regarding the noose incident.

46. On November 30, 2010, Earl McDonald ("McDonald"), General Foreman, called Devers, Zavala, and Moore "cry babies" for complaining to the Union about the noose and also stated, "No more Mr. Nice Guy. From now on if anyone is one minute late from break, I will fire them.".

47. Devers called Geiger and complained to him regarding McDonald's comments.

48. Later that day, Geiger and Antonucci returned to the worksite and again interviewed several employees. As a result of Geiger and Antonucci's visit, McDonald told Devers, Zavala, and Moore, in front of Geiger, "I will make sure that this week is your last."

49. Devers told McDonald that his comments were retaliatory.

50. Then, Geiger warned McDonald not to take any retaliatory action against Devers, Zavala, and Moore for their complaints of discrimination.

51. Later that day, Ramadan Ibric and Eddie Brandon, investigators from the Union's Inspector General's office, visited the worksite to conduct employee interviews regarding Devers, Wood, Zavala, Moore, and DiGiorno's complaints of discrimination.

52. On December 1, 2010, days after their most recent complaints of discrimination, Welda terminated Devers, Zavala, and Moore.

53. After terminating them, Welda told Devers, Zavala, and Moore, "You piss down my back, now I'm going to piss down yours. I'm not going to change. I don't care what anyone says, I'm going to run my job the way I want."

54. Welda then said he had terminated Devers, Zavala, and Moore due to a work shortage. However, four days after Welda fired Devers, Zavala, and Moore, Peterson Industrial hired three to five new employees to replace them.

## **CLAIMS FOR RELIEF**

55. As described above, Defendants SNC–Lavalin and Peterson Industrial have taken adverse employment actions against Plaintiffs (including termination), subjected them to a hostile work environment and/or maintained an atmosphere of adverse actions, which where were motivated, in part, by Plaintiffs' races and/or their opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law, the New York City Human Rights Law.

56. As more fully set forth above, the individual Defendant Welda, aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law, the New York City Human Rights Law.

WHEREFORE, Plaintiffs demand judgment against all Defendants in the form of and/or for compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, interest, injunctive relief, and any other damages permitted by law. Plaintiffs also demand judgment against Defendants for each cause action and for all applicable and permissible damages, in an amount to be assessed at the time of trial. The Plaintiffs further seek injunctive relief, including but not limited to, the clearing of their personnel file of any wrongful disciplinary actions, immediate reinstatement, and a

permanent injunction enjoining all Defendants and their agents from any further actions abridging Plaintiffs' rights. Plaintiffs further demand all attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to which Plaintiffs are entitled and/or which the court deems just and proper.

Dated: Carle Place, New York
      July 26, 2012

                              LEEDS MORELLI & BROWN, P.C.
                              Attorneys for Plaintiff
                              One Old Country Road, Suite 347
                              Carle Place, New York 11514
                              (516) 873-9550

                              THOMAS RICOTTA