UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
PATRICK DEVERS, et al.,

                Plaintiffs,

                **MEMORANDUM & ORDER**
                12 CV 3747 (RJD) (CLP)

- against -

SNC-LAVALIN GENERATION, INC.,
PETERSON INDUSTRIES SCAFFOLDING,
INC., and CHARLES WELDA,

                Defendants.
----------------------------------------------------------- x
DEARIE, District Judge

       In this employment discrimination and retaliation case, five union carpenters bring Title VII and state and local claims[1] against their former employer, Peterson Industrial Scaffolding ("Peterson"), and its site manager, Charles Welda. Two of the plaintiffs are black and bring hostile work environment claims. All five plaintiffs allege that they were terminated in retaliation for complaining about racial problems at the worksite. The defendants seek summary judgment on all of the retaliation claims and on the hostile work environment claim brought by plaintiff David Wood. (They do not seek summary judgment on the hostile work environment claim brought by Patrick Devers, the other black plaintiff.) For the reasons set forth below, summary judgment is granted as to Wood's hostile work environment and retaliation claims, but denied as to the remaining plaintiffs.

---

[1] The plaintiffs bring state and local claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

BACKGROUND

The parties contest the factual background. On summary judgment, of course, the Court construes the evidence in the light most favorable to the non-moving parties and draws all inferences in their favor. The following narrative should be read accordingly.

Peterson provided scaffolding services to SNC-Lavalin Generation for the construction of a power plant in Queens. Defs.' Rule 56.1 Statement, ECF No. 55 ("D") ¶¶ 8-10. Welda, who is originally from Louisiana, was Peterson's manager for the project. D ¶ 2. Peterson hired Patrick Devers, who is black, as a foreman on the project in February 2010. D ¶¶ 3, 13-14. Plaintiffs Collis Moore, Joseph DiGiorno, and Rivelino Zalava were hired as carpenters in May and June 2010. D ¶¶ 5-7, 19-21. Peterson hired Wood, who is black, in early July. D ¶¶ 4, 20.

Peterson employees were required to sign-in on a notebook that Welda carried with him. The notebook bore a sticker depicting the profile of a woman on her hands and knees superimposed over the "stars and bars" of the Confederate flag. Welda displayed similar stickers on his hard hat and on his car. D ¶ 72; Ricotta Decl.[2] ("P") Ex. 1 (Devers dep.) at 119-20; P Ex. 2 (Wood dep.) at 36, 52-53. At one point, Devers told Welda that other employees considered the Confederate flag stickers inappropriate. According to Devers, Welda responded, "Who is asking questions? I'll lay their asses off." P Ex. 1 at 127-28.

The plaintiffs claim that Welda made a number of derogatory statements to and about black employees during their tenure on the worksite. Welda described Wood, who was very tall, as a "big black buck." Wood heard this remark on two occasions. Every morning, the Peterson employees had a "toolbox meeting" to prepare for the day. At these meetings, Welda made at least five references to bringing in "good ole boys from the South" to do the work if the New

---

[2] The plaintiffs provided the Ricotta Declaration and its accompanying exhibits to the defendants and the Court in hard copy. See ECF No. 60.

York carpenters were unable to handle the summer heat. D ¶ 69. When Devers asked Welda what he meant by "good ole boys," Welda said that he meant people from the South who "want to bring Dixie back." Devers believed that "Dixie" was a reference to slavery. P Ex. 1 at 107-08. Welda did in fact hire several additional workers from the South, but at least one was black. P Ex. 4 (DiGiorno dep.) at 63-64.

Welda apparently made a number of more offensive remarks in the presence of Devers and Moore. For example, according to Devers, Welda repeatedly called him "nigger" and made derogatory comments about the hair and skin of other black employees. See, e.g., D ¶¶ 64-67; P Ex. 1 at 104, 110, 113. Welda also made several comments about the futility of a civil rights lawsuit, claiming that "the union or something tried it in St. Louis, but they ended up on their knees ... sucking Peterson's dick, and that New York was going to be the same way." P Ex. 1 at 88. According to Moore, Welda described black employees as "niggers" and "nappy-headed, lazy fucks" between ten and twenty times. D ¶¶ 59-62. Moore claims that other employees heard these comments, including the plaintiffs, though none of the other plaintiffs testified to the language recounted by Moore.[3]

In September, Wood and other members of the crew complained to Angel Cedeno, another Peterson employee, who was the shop steward and represented the union at the worksite. See, e.g., P Ex. 3 (Moore dep.) at 69. As shop steward, Cedeno was responsible for transmitting employee complaints to management and the union. P Ex. 3 at 54. Wood also expressed his

---

[3] DiGiorno heard Welda make two racial comments: one related to "big black bucks" and another about "good ole boys." D ¶¶ 28-30, 33. Wood heard two references to a "big black buck" (apparently directed at him) and more than five references to "good ole boys." D ¶¶ 37-40. Zavala heard Welda talk about two black employees' hair (one was Devers). D ¶¶ 46-47. He also learned from other plaintiffs that Welda called Wood a "big black buck" at a basketball game. D ¶ 50. The comments that Devers attributes to Welda (as recounted above) are more severe, but occurred in the context of one-on-one conversations.

3

complaints to Cedeno one-on-one. The complaints related to Welda's racial comments as well as a number of other issues on the job site, including difficult working conditions, lack of water, excessive heat, problems with the distribution of overtime, and the lack of cooling vests (which had been banned by Peterson for safety reasons because they were leaking). Wood also raised these issues with Joe Geiger, the president of the local union chapter, at a monthly union meeting in September 2010. P Ex. 2 at 39-44.

Wood was laid off on October 27, 2010, along with three other employees. Welda told Wood that he was being let go as part of a scheduled reduction in force, and that he was chosen because he was not working hard enough. D ¶ 148-50; P Ex. 2 at 66-68. Wood states that Welda never took issue with his work product prior to the termination, but he also characterizes the "big black buck" comments as occurring in the context of Welda's dissatisfaction with his output. For his part, Devers describes Wood as a good worker, and at some point during the summer or early autumn, Devers's crew won a safety award from the general contractor. P Ex. 1 at 82. Peterson subsequently hired other employees, including a black employee, from the union rolls. D ¶ 152.

On November 15, 2010, Devers and his crew found a rope tied in a noose hanging from a piece of construction equipment at their job site. D ¶ 82. They believed that the noose was hung by employees of another subcontractor and interpreted it as a sign of racial animosity. P Ex. 1 at 135-36; P Ex. 4 at 70, 80. Initially Devers and his crew were afraid to report the noose because they thought that they would be fired for complaining. But they viewed the noose as a threat, particularly given the vulnerability inherent in working high in the air on scaffolding. P Ex. 1 at 136-41.

At the toolbox meeting the next day, Devers and the other plaintiffs showed the noose to Welda. Welda denied that the knot was a noose, and suggested instead that it was just the way New Yorkers tied knots. Devers took offense to Welda's refusal to acknowledge the noose, particularly given its racial symbolism. DiGiorno backed Devers and said that the knot was a noose and was not a knot typically used in construction. P Ex. 1 at 137-149.

Welda was upset with Devers and DiGiorno, and told them that if they believed that the knot was a noose, they should "jump" the other contractors. Devers took this comment as an attempt to cover up the incident. Welda twice warned Devers and his crew not to complain about the noose and warned them not "to do anything that could cause you to, you know, lose work." P Ex. 1 at 149-54. After the toolbox meeting, Devers and the crew complained to Cedeno and a Peterson safety officer, neither of whom took action. P Ex. 4 at 80-81; P Ex. 5 at 115.

DiGiorno was terminated two days later, on November 18. That morning, Welda warned employees not to enter "red-roped" or restricted areas because an employee of another subcontractor had been injured the previous day. A half-hour later, DiGiorno noticed a safety issue in a red-roped area and crossed the line to address it. Welda learned that DiGiorno had crossed into a red-roped area and immediately fired him. According to DiGiorno and the other plaintiffs, Peterson employees had regularly entered red-roped areas in the past, and were encouraged to be proactive to fix any safety problems that they observed. D ¶¶ 136-42; P Ex. 4 at 91-93. Several months later, DiGiorno was hired off the union rolls to work on another Peterson project at the Apple Store in midtown. He was terminated three days later, shortly after Welda or another Peterson supervisor recognized him as a member of Devers's crew. P Ex. 4 at 24-26.

5

At a union meeting on November 23, 2010, the plaintiffs, led by Devers, raised their concerns about the noose incident, Welda's racial comments, and other safety concerns. See, e.g., P Ex. 1 at 173-75; P Ex. 3 at 70-73. Geiger (the union president) told Devers that he should take his complaints to a lawyer who had been appointed by a federal court to monitor the unions. D ¶ 112. Devers called the lawyer's office and made a complaint about discrimination and other problems on the job site. D ¶ 113; P Ex. 1 at 175-76.

Several days later, around November 29, 2010, Geiger and another union representative showed up at the job site to speak with employees. They spoke to Devers and the rest of his crew. P Ex. 1 at 182-83. Welda was on vacation, but Earl McDonald, Welda's second-in-command, told Geiger that the noose reminded him of Cowboys and Indians (rather than lynchings). P Ex. 1 at 186.

At the toolbox meeting the next day, McDonald said that Devers and his crew were the biggest crybabies that he'd ever seen. He also said there would be no more Mr. Nice Guy and that he would fire them if they did anything wrong, including show up a minute late from break. Devers responded that McDonald's threat was classic retaliation and told the employees the union's hotline number so that they could report any problems. McDonald tried to shout Devers down. P Ex. 1 at 188-92. Later that day, two investigators from the union's Inspector General's Office visited the job site to investigate the noose incident. D ¶ 116; P Ex. 1 at 176-82. The investigators spoke to Zavala about the noose, but he also told them that his "[o]nly problem is just with the [lack of] water." P Ex. 5 at 115-16. Moore specifically complained about the noose and racial slurs. D ¶ 122.

At the toolbox meeting the next morning, December 1, 2010, Welda told the gathered employees that they had pissed down his back by complaining to the union, and now he was

6

going to piss down theirs. P Ex. 1 at 198; P Ex. 5 at 86-89. At noon, Devers, Moore and Zavala were fired, ostensibly because their work was complete. However, Peterson retained two other members of the crew, neither of whom had complained and at least one of whom was not qualified to build scaffolding. Additional workers were subsequently hired off the union rolls to work at the site. P Ex. 1 at 198-200. This lawsuit followed.

ANALYSIS

A.  Hostile Work Environment

The defendants seek summary judgment on Wood's hostile work environment claim. The gravamen of a hostile work environment claim is that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). The test has objective and subjective elements: the misconduct must create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment as such. Rivera, 743 F.3d at 20. Wood's testimony establishes that the subjective prong is met.

The question, rather, is whether the incidents that he describes are sufficient to create an objectively hostile environment. The standard is high. "For racial comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated instances of racial enmity, meaning that instead of sporadic slurs, there must be a steady barrage of opprobrious racial comments." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends on the quantity, frequency, and severity of those slurs, considered

7

cumulatively in order to obtain a realistic view of the work environment." Id. at 110-11 (internal quotation marks and citations omitted); see also Aulicino v. New York Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009) (listing factors). Courts also consider whether the discriminatory conduct is "physically threatening or humiliating" and whether it "unreasonably interferes with an employee's work performance." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Measured against this standard, the record does not support Wood's hostile work environment claim. Wood personally experienced two types of racial comments during his three months of employment on the job site: Welda's characterization of him in two instances as a "big black buck" and Welda's occasional threat to hire "good ole boys from the South" to replace lagging employees. These comments are not salutary, but in the context of racial slurs, they are not particularly severe. See, e.g., Greene v. Trs. of Columbia Univ., 234 F. Supp. 2d 368, 379 (S.D.N.Y. 2002) (Knapp, J.) (adopting and including magistrate's report and recommendation). They are neither physically threatening nor particularly humiliating. Nor did they occur with great frequency.

Wood also takes issue with the stickers on the sign-in sheet and Welda's hardhat. There is no question that the display of the Confederate flag recalls a history of racial oppression that is offensive to many, and justifiably so. See, e.g., Kemp v. CSX Transp., Inc., 993 F. Supp. 2d 197, 212-13 (N.D.N.Y. 2014) (Hurd, J.); Bishop v. Tyson Foods, Inc., 660 F. Supp. 2d 1004, 1021 (W.D. Ark. 2009). Nonetheless, the presence of three Confederate flag stickers at a worksite is not sufficient to support a hostile work environment claim, even in conjunction with the isolated insensitive remarks discussed in the preceding paragraph. See Mays v. Town of Hempstead, No. 10 CV 3998, 2012 WL 5866230, at *2, 6-7 (E.D.N.Y. Nov. 16, 2012) (Wexler,

J.); Smith v. New Venture Gear, Inc., No. 05 CV 1151, 2008 WL 200015, at *54 (N.D.N.Y. Jan. 22, 2008) (Mordue, J.).

Finally, Welda made a number of offensive comments in the presence of Devers and Moore while Wood was employed at the jobsite, though Wood was either not present for those remarks or does not remember them. Racially-charged incidents and epithets that occur outside the plaintiff's presence, "if part of a pervasive or continuing pattern of conduct, [are] surely relevant to show the existence of a hostile environment." Schwapp, 118 F.3d at 111-12 (2d Cir. 1997); see also Rivera, 743 F.3d at 21; Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000). The focus of the analysis, however, is whether the harassment was of such a degree that it adversely impacted the terms and conditions of employment. See Schwapp, 118 F.3d at 111; Fenner v. News Corp., No. 09 CV 9832, 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013) (Schofield, J.). There is no evidence that Wood was aware of Welda's offensive comments to Devers or Moore, and if he was, they do not appear to have been sufficiently offensive to have left an imprint on his memory. Under these circumstances, Wood cannot show that these comments impacted his conditions of employment. He is thus unable to make out a federal or state claim for hostile work environment.[4] See Leibovitz v. New York City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001); Fenner, 2013 WL 6244156, at *13-15.

---

[4] Hostile work environment claims under Title VII and the NYSHRL are governed by the same standards, see Fenner, 2013 WL 6244156, at *12, and thus the Court assesses them together. The NYCHRL is more protective of employees, and requires only that the plaintiff show that his employer treated him less well than similarly situated employees, at least in part for discriminatory reasons. See id. The Court declines to exercise jurisdiction over Wood's NYCHRL claims, however, given that his federal and state claims are dismissed. See 18 U.S.C. § 1367(a).

9

B.  Retaliation

1.  NLRA Preemption

All five plaintiffs bring retaliation claims. As a threshold matter, the defendants contend that these retaliation claims are preempted by the National Labor Relations Act ("NLRA"). "[W]hen an activity is arguably subject to § 7 or § 8 of the NLRA, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board.'" Domnister v. Exclusive Ambulette, Inc., 607 F.3d 84, 89 (2d Cir. 2010) ("Domnister II") (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 256, 245 (1959)) (alterations omitted). "Section 7 protects workers' rights to engage in concerted activity, while Section 8 makes it an unfair labor practice for an employer to violate the rights outlined in § 7 as well as to 'to discharge or otherwise discriminate against an employee because he has filed charges or given testimony' about an unfair labor practice." Domnister II, 607 F.3d at 84 (quoting 29 U.S.C. §§ 157, 158(a)).

The defendants argue that, to the extent the defendants were retaliated against, the retaliation was prompted by their complaints to the union. The plaintiffs did complain to the union, of course, and it appears that the union's response to these complaints was the catalyst for their termination. But the substance of the claims at issue here is not that the plaintiffs were terminated because they complained to the union—an action presumably subject to the NLRA—but rather that they were terminated because they protested racial discrimination and harassment by their employer.[5] In effect, the defendants ask the Court to find that an employee who is

---

[5] The preemption argument also fails for a factual reason: the plaintiffs expressed their concerns about the noose to Welda and other Peterson supervisors as well as to the union. Even if Garmon preemption were applicable to the plaintiffs' complaints to the union, it would not foreclose their claims because the record is sufficient for a reasonable jury to conclude that the plaintiffs were terminated for complaining to their supervisors.

10

terminated for complaining to his boss about racial harassment has a civil rights claim, but that same employee gives up his civil rights remedy if he is terminated after his boss learns that he brought the racial harassment to the attention of his union. This would be a curious result.

As for the federal claims, Garmon preemption does not apply because "Title VII and the NLRA, as federal statutes, enjoy 'concurrent jurisdiction' over discrimination claims in the context of labor disputes." Domnister v. Exclusive Ambulette, Inc., No. 03 CV 1666, 2008 WL 2157115, at *3 n.4 (E.D.N.Y. May 21, 2008) (Garaufis, J.) ("Domnister I") (citing Britt v. Grocers Supply Co., Inc., 978 F.2d 1441, 1447 (5th Cir. 1992)); see also Shipkevich v. Staten Island Univ. Hosp., No. 08 CV 1008, 2009 WL 1706590, at *6 (E.D.N.Y. June 16, 2009) (Block, J.) ("The NLRA does not preempt Title VII claims."); Pelech v. Klaff-Joss, LP, 828 F. Supp. 525, 530 (N.D. Ill. 1993) (Aspen, J.), overruled on other grounds by statute.[6]

Nor are the plaintiffs' state and local claims subject to preemption. The thrust of these retaliation claims is that the plaintiffs were terminated for complaining about racial problems at the worksite, not for opposing unfair labor practices of the type addressed by the NLRA. Thus Domnister II is apposite.[7] In that case, ambulance drivers brought state and local claims alleging

---

[6] Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 47-49 (1974) (explaining that "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes").

[7] The messy procedural background of Domnister cases is described here for purposes of clarity. The Domnister plaintiffs initially brought a series of labor and civil rights claims in the Eastern District of New York focused on discrepancies between various collective bargaining agreements. See Domnister II, 607 F.3d at 86 (recounting procedural history). In Domnister I, the district court held that the state and local retaliation claims were preempted by the NLRA. 2008 WL 2157115, at *4. The plaintiffs then filed a new state court lawsuit that omitted any reference to the collective bargaining agreements. See Domnister II, 607 F.3d at 87. After the defendants removed the state court lawsuit to federal court, the district court held that the new claims were also preempted by Garmon. Id. at 88. In Domnister II, the Second Circuit overturned the district court with respect to the newly plead state claims, concluding that they did

11

that they suffered discrimination on the basis of their national origin and were terminated when they complained to the employer and their union. Even though a previous complaint based on the same underlying circumstances had been preempted by the NLRA because it specifically alleged unfair labor practices, the Second Circuit held that the new complaint was not preempted because the plaintiffs:

> d[id] not claim to be entitled to coverage under any [collective bargaining] agreement, or to have acted in concert in any fashion. Instead, the complaint alleges discrimination based on terms and conditions of employment, and retaliation for having complained of that unequal treatment. As written, there is no suggestion in plaintiff's state-court complaint that a CBA or any [union] activity will play a role in the case. Simply put, [the] complaint alleges plain vanilla employment discrimination. ***As 'masters of the complaint,' plaintiffs were entitled to construct their complaint in this fashion, regardless of the existence of collective agreements.***

Id. at 90 (emphasis added). Like the plaintiffs in Domnister II, the plaintiffs here might have chosen to bring union-related claims, but they did not—and that was their choice as "masters of the complaint." And as in Domnister II, the plaintiffs' retaliation claims do not require the Court to resolve any questions of labor law. Because the complaint at issue here "neither invokes, nor substantially relies upon, any collective agreement, [it] therefore is *not* subject to Garmon preemption."[8] Id. at 89; see also Shipkevich, 2009 WL 1706590, at *6.

---

not implicate the collective bargaining agreements, were not preempted, and thus were not properly removed to federal court. Id. at 88-92.

[8] At oral argument, counsel for the defendants cited GGLM, Inc. & Alan Kansas, 350 N.L.R.B. 974 (2007) and Dearborn Big Boy No. 3, Inc., 328 N.L.R.B. 705 (1999) for the proposition that complaints of racial harassment can be brought to the attention of the National Labor Relations Board. These cases, in fact, illustrate why preemption is not appropriate here. In GGLM, the NLRB was called upon to determine whether employees who went on strike to protest perceived racial discrimination had engaged in labor activity protected by the NLRA. In Dearborn Big Boy No. 3, the NLRB was called upon to determine whether an employer violated the NLRA by firing an employee for counseling another employee to file a racial discrimination lawsuit. As Domnister II suggests, the employees in GGLM and Dearborn Big Boy No. 3 might

12

The main case cited by the defendants in support of preemption is distinguishable. In Chaulk Servs. v. Mass. Com'n Against Discrimination, a female paramedic brought a state-law discrimination claim based on allegations that her employer retaliated against her for union activity, but not against male colleagues engaged in the same union activity. 70 F.3d 1361, 1363 (1st Cir. 1995). She alleged that she was punished *for union organizing* because she was a woman. The First Circuit concluded that her claim was preempted by the NLRA because it was "at bottom ... a classic example of an unfair labor practice claim of the kind traditionally handled in the first instance by the NLRB." Id. at 1367. In this case, however, the plaintiffs allege retaliation *for complaining about racial discrimination* to both the union and their employer, which is an archetypical civil rights retaliation claim.[9]

2. The Elements: Protected Activity and Causal Connection

The defendants contend that the record is insufficient to support the retaliation claims. "To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013).

---

perhaps have recast their claims as civil rights violations. But the labor law claims in those cases—unlike the civil rights claims at issue here—required analysis of the NLRA, at least in the form they were presented to the NLRB.

[9] Another First Circuit case, Morgan v. Mass. Gen. Hosp., 901 F.2d 186 (1st Cir. 1990), lends further support to the conclusion reached by this Court: "[i]f an employee has engaged in expression against employer policies, even within the context of union activities, which violates the Civil Rights Act, such as discriminatory treatment of minorities or sexual harassment, and the employee alleges discharge for that expression, [Title VII] would be implicated for the narrow expression-related claims." Id. at 194.

13

The McDonnell-Douglas framework applies. Once the plaintiff makes out a prima facie case, the burden turns to the employer to articulate "a legitimate, non-discriminatory reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). "For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Id. (internal quotation marks and citations omitted); see also Milione v. City Univ. of New York, 567 F. App'x 38, 41 (2d Cir. 2014) (applying the burden-shifting framework in a retaliation case).

(a) Devers, Zavala, DiGiorno, and Moore

The defendants make two main arguments: (1) that DiGiorno and Zavala did not engage in protected activity; and (2) that the plaintiffs cannot show that their terminations were motivated by retaliation, given the non-discriminatory rationales advanced by the defendants.

The defendants contend that DiGiorno and Zavala did not protest or oppose statutorily prohibited discrimination and thus did not engage in protected activity. "Opposition to a Title VII violation," however, "need not rise to the level of a formal complaint in order to receive statutory protection." Cruz, 202 F.3d at 566. "[T]he law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." La Grande v. DeCrescente Dist. Co., 370 F. App'x 206, 212 (2d Cir. 2010). "It is not necessary that the [protested] conduct is actually prohibited by Title VII, but only that the plaintiff had a 'good faith belief' that such conduct was prohibited."

Bowen-Hooks v. City of New York, --- F. Supp. 2d ----, No. 10 CV 5947, 2014 WL 1330941, at *25 (E.D.N.Y. Mar. 31, 2014) (Brodie, J.).

Measured against these standards, DiGiorno and Zavala both engaged in protected activity. With respect to DiGiorno, the defendants argue that his complaints about the noose and his support for Devers at the toolbox meeting were not protected activity because the noose "was not an instance of racial intimidation perpetrated by Welda." This argument misapprehends the significance of the noose incident. Whether or not Welda hung the noose—and it seems clear that he did not—DiGiorno and the other plaintiffs believed that it was a threatening expression of racial animus directed at Devers.[10] By supporting Devers at the toolbox meeting and by raising the noose incident with a Peterson safety officer, DiGiorno protested his employer's failure to take steps to address a racially offensive incident in the workplace. That is protected activity. See La Grande, 370 F. App'x at 212 (male employee who complained about the sexual harassment of a female co-worker had engaged in protected activity).

With respect to Zavala, the defendants focus on deposition testimony to the effect that Zavala told the union investigators that his "[o]nly problem is just with the [lack of] water." See P Ex. 5 at 116, 127-31. Despite this remark, it is apparent that Zavala joined his co-workers' complaints about the noose at the toolbox meeting and at the November 23, 2010 union meeting, and that he discussed the noose with the union investigators. See P Ex. 5 at 111, 116. On this record, a reasonable jury could find that he too engaged in protected activity.

---

[10] While the defendants deny that the noose had any racial connotation or that DiGiorno interpreted it as such, DiGiorno's deposition testimony indicates otherwise. P Ex. 4 at 70, 80. The Court also notes that the noose has been described as "among the most repugnant of all racist symbols, because it is itself an instrument of violence." Williams v. New York City Housing Auth., 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) (Carter, J.).

15

The Court now turns to the defendants' argument that the plaintiffs cannot demonstrate a causal connection between protected activity and termination given the non-discriminatory reasons proffered by Peterson. When an employer advances a legitimate, non-discriminatory reason for an adverse employment action, the plaintiff must point to sufficient evidence to allow a reasonable jury to find "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Kwan v. Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)). Courts look to the totality of the circumstances to determine whether "the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Weinstock, 224 F.3d at 42. Here, the defendants assert that Devers, Moore, and Zavala were simply fired as part of a scheduled reduction in force. Given the repeated and explicit threats of retaliation from Welda and MacDonald, not to mention the timing of the termination and the continued employment of non-complaining carpenters, Devers, Moore, and Zavala easily meet their summary judgment burden.

DiGiorno, however, requires a closer analysis because the reason that Peterson offers for his termination is straightforward and facially plausible. According to the defendants, DiGiorno was fired because he crossed into a prohibited red-roped area just minutes after Welda ordered employees not to enter those areas. DiGiorno does not dispute the factual circumstances. He contends, rather, that he entered the red-roped area to fix an obvious safety problem and that he did so because Peterson encouraged its employees to be proactive in addressing safety risks. He and the other plaintiffs also stated that Peterson employees regularly entered red-roped areas, and that termination was an unprecedented sanction for such a violation. Viewed in conjunction with the timing of DiGiorno's termination (two days after the toolbox meeting) and Welda's explicit

threats of retaliation against employees who complained about the noose or other racial issues (both before and after DiGiorno was fired), this evidence would permit a reasonable jury to conclude that the rationale for firing DiGiorno was pretextual and that he would not have been fired if he had not complained about the noose. See, e.g., Kwan, 737 F.3d at 845 (temporal proximity between complaint and termination, plus inconsistencies in justifications for termination, created material question of fact as to retaliatory intent).

(b) Wood

The factual circumstances of Wood's retaliation claim differ from those of the other plaintiffs because he was fired several weeks before the noose incident. Wood is unable to show retaliation for two reasons. First, while the record indicates that he complained to the union about Welda's racial comments (and other worksite issues), there is no evidence that suggests that these complaints were passed along to Welda or other Peterson employees. Second, the defendants assert that Wood was terminated as part of a scheduled reduction in force because he was not working as hard as others. Devers's description of Wood as a good worker and the safety award that the crew won from SNC-Lavalin do not meaningfully undercut that rationale. Because there is insufficient evidence to establish that Welda or Peterson were aware of Wood's complaints to the union or that the proffered reason for Wood's termination was pretextual, he cannot show that his termination would not have occurred absent a retaliatory motive. See, e.g., Sarkis v. Ollie's Bargain Outlet, 560 F. App'x 27, 30 (2d Cir. 2014).[11] The Court declines to exercise jurisdiction over Wood's NYCHRL retaliation claim. See supra n. 4.

---

[11] Title VII and NYSHRL retaliation claims are governed by the same substantive legal principles. Sarkis, 560 F. App'x at 29 n.1.

17

C.  Individual Claims Against Charles Welda

The defendants also seek summary judgment on the individual claims against Welda. Because Title VII does not permit individual liability, Welda is entitled to summary judgment on the plaintiffs' remaining federal claims. Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012). The NYSHRL and the NYCHRL recognize individual liability, however, and summary judgment is denied as to those claims. Id.; see also Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 487 (S.D.N.Y. 1999) (Carter, J.).

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is GRANTED with respect to plaintiff David Wood's federal and state claims. The Court declines to exercise supplemental jurisdiction over Wood's NYCHRL claim. The motion for summary judgment is DENIED with respect to the federal, state, and local retaliation claims pursued by the remaining plaintiffs.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2014

/s/ Judge Raymond J. Dearie

```
RAYMOND J. DEARIE
United States District Judge
```